FRIER LEVITT
ATTORNEYS AT LAW
Jonathan E. Levitt, Esq. (Bar No. 65680)
Todd Mizeski, Esq. (Bar No. 25122001N)
Lucas W. Morgan, Esq. (Bar No. 120222014N)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
Attorneys for Plaintiff, SPRX, Inc. d/b/a InjuryScripts

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SPRX, INC. D/B/A INJURYSCRIPTS,<br><br>Plaintiff,<br>vs.<br><br>EXPRESS SCRIPTS, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No.________________<br><br>**VERIFIED COMPLAINT AND JURY DEMAND**<br><br>**(JURY TRIAL DEMANDED)** |

## **VERIFIED COMPLAINT AND JURY DEMAND**

Plaintiff, SPRX, Inc. d/b/a InjuryScripts ("Plaintiff" or "InjuryScripts"), by and through its attorneys, **FRIER & LEVITT, LLC**, and by way of Complaint against Defendant, Express Scripts, Inc. ("Defendant" or "Express Scripts"), alleges as follows:

## **PRELIMINARY STATEMENT**

1. Plaintiff, InjuryScripts, brings this Verified Complaint in response to Express Scripts' improper termination of InjuryScripts from network participation effective **December 15, 2023**. Express Scripts' stated basis for terminating InjuryScripts is an allegation that InjuryScripts did not disclose certain information that Express Scripts claims should have been disclosed

pursuant to the parties' agreement. See **Exhibit A**. The information that Express Scripts alleges was not disclosed pertains to a *qui tam* matter previously brought by the Department of Justice ("DOJ") against InjuryScripts' owners, William Scrogins and Gregory Balotin (the "Owners") and two other pharmacies under their ownership, Smart Pharmacy, Inc. ("Smart Pharmacy") and SP2, LLC ("SP2"), in the United States District Court for the Middle District of Florida; a matter that was subsequently dismissed as a result of a settlement agreement reached between the parties. However, as discussed below, the allegation by Express Scripts that this matter was not disclosed is inaccurate.

2. Documents and communications exchanged between Smart Pharmacy and SP2's predecessor counsel and Express Scripts show that Express Scripts knew about the *qui tam* matter and the underlying allegations as early as May 2019, a date which precedes Express Scripts' termination letter. Express Scripts also knew of the settlement agreement resolving the *qui tam* matter. This is because as part of the settlement, the Owners and Smart Pharmacy agreed to release pending legal claims they had against Express Scripts including specifically those arising in a litigation titled *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.).

3. Given the inaccuracy of Express Scripts' allegations relied upon to justify InjuryScripts' termination, termination is not permitted under the parties' agreement and applicable law. Moreover, Express Scripts' conduct under these circumstances is **retaliatory in nature** and prohibited under the various contracts and applicable law governing the parties' relationship. Therefore, the termination must be enjoined to prevent irreparable harm. This Verified Complaint is submitted in conjunction with Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

## THE PARTIES

4. Plaintiff, InjuryScripts, is a pharmacy located in Jacksonville, Florida with its principal office located at 3740 Saint Johns Bluff Rd. S Suite, Jacksonville, Florida 32224.

5. Defendant, Express Scripts, Inc. ("Express Scripts"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Missouri. Defendant Express Scripts is a citizen of the States of Delaware and Missouri.

## JURISDICTION AND VENUE

6. Jurisdiction over this matter by this Court is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship in that the Plaintiff, InjuryScripts, is a citizen of the State of Florida with its place of business in Florida, while Defendant Express Scripts is a corporation existing under the laws of the State of Delaware with a principal place of business in the State of Missouri. The amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

7. Jurisdiction is also found under 28 U.S.C. § 1331 because Plaintiff, InjuryScripts, asserts claims arising under federal law, including Medicare's Any Willing Provider Law. See 42 U.S.C. § 1395w-104(b).

8. This Court has jurisdiction over any claims arising under state law pursuant to the Court's supplemental jurisdiction found under 28 U.S.C. § 1367.

9. In addition, venue is proper pursuant to the Network Provider Manual – which forms part of the contractual agreement between InjuryScripts and Express Scripts – and requires "[a]ll litigation between the parties . . . [to] be litigated in the U.S. District Court for the Eastern District of Missouri[.]"[1]

---

[1] Plaintiff notes that Counts II and VIII of this Verified Complaint relate to a 2023 Settlement Agreement (defined and discussed below) that contains a provision designating the United States District Court for the Middle District of

## INTRODUCTION AND FACTUAL BACKGROUND

### InjuryScripts

10. InjuryScripts is owned and operated by two pharmacists, Gregory Balotin ("Balotin") and William Scrogins ("Scrogins"). Founded in 2007, InjuryScripts is a state-of-the-art compounding pharmacy that specializes in providing patients with medications prepared specifically for their individual needs.

11. Compounding is the process by which a pharmacist combines, mixes or alters ingredients prescribed by a physician to create a medication clinically specified to meet the individual needs of each patient. Compounding is typically used to prepare medications that are not commercially available to target patient conditions such as dosage limitations, intolerance to ingredients, to create a discontinued medication that has proven effective for a patient, or for a variety of other personalized reasons.

12. Compounding is fundamental to the pharmaceutical profession. Before manufacturers produced drugs in mass quantities, compounding was the original method by which medicines were prepared.

13. InjuryScripts has provided, and continues to provide, high-quality compounding services while focusing on fostering and maintaining long-term patient relationships. As but one example of a way in which compounding serves a public need, the ability of compounding pharmacies, like InjuryScripts, to create permeation-enhancing topical medications has helped combat the opioid epidemic by creating alternative forms of pain treatment.

14. InjuryScripts also operates as a specialty pharmacy that provides healthcare

---

Florida as the exclusive venue for any dispute arising thereunder. See Exhibit D at ¶ 5. However, given the various contract documents mandating litigation involving Express Scripts to be filed in the Eastern District of Missouri – Eastern Division, Plaintiff brings this case in the Eastern District of Missouri – Eastern Division.

services to patients with complex disease states. Patients requiring specialty medications are often among the sickest and most vulnerable in the country.

15. The complexity of the patient population InjuryScripts treats requires services distinct from those provided at traditional retail pharmacies. For instance, the process of acquiring, storing, gaining approval from insurance companies to dispense specialty medications, dispensing such medications, and managing patient adherence to such medications is far more complex and involved when compared with traditional retail pharmacies dispensing retail medications.

16. Many specialty and compound medications require prior approval from insurance companies before a patient can begin treatment, often referred to as "prior authorization." InjuryScripts works closely with prescribers and insurance companies to ensure patients obtain prior authorization to fill their medications in an efficient and orderly manner.

17. InjuryScripts is accredited by the Accreditation Commission for Health Care's ("ACHC") Pharmacy Compounding Accreditation Board ("PCAB"). The PCAB establishes rigorous national standards that each pharmacy must meet and maintain. The standards are intended to ensure that PCAB accredited pharmacies maintain sound practices, processes, facilities, equipment and personnel to prepare compounded medications for their patients. InjuryScripts is one of only 32 providers in the State of Florida with such recognition.

18. InjuryScripts' achievement of these high standards places it in an elite category of healthcare and pharmacy providers. Its recognition as a quality compounding pharmacy is indicative of the unique and specialized services that are important to patients and the various healthcare providers that InjuryScripts works with.

19. InjuryScripts has devoted considerable time and resources toward developing its strong reputation and cultivating relationships with patients and prescribers in the community.

**Express Scripts**

20. Express Scripts is a Pharmacy Benefit Manager ("PBM"). PBMs are essentially third-party contractors tasked with administering the prescription drug benefit plans of insurance carriers and a variety of plan sponsors offering medical and prescription drug benefits.

21. PBMs are major players in the delivery of healthcare in the United States. They act as middlemen in the lucrative business of providing prescription drugs. The services that PBMs provide are designed to facilitate the provision of prescription drug benefits to the people who utilize the services of the health benefit providers.

22. The PBM industry has undergone drastic changes over recent years. Approximately 80% of the PBM marketplace (or 80% of the covered lives in the United States) is comprised of four PBMs: (1) Express Scripts; (2) CVS/Caremark; (3) OptumRx; and (4) Prime Therapeutics.

23. While pharmacies may service a variety of patients, most prescription drug benefits are managed and administered by these four massive PBMs. Express Scripts, as one these four PBMs, dictates the terms of pharmacy participation through Pharmacy Provider Agreements, a Network Provider Manual, and numerous provider communications and Network Updates.

24. Express Scripts leverages its marketplace dominance to exert complete control over the terms of network participation and the manner in which a participating pharmacy is reimbursed and performs in the network.

25. Express Scripts manages prescription drug benefit plans for not only private insurance companies and large employers, but also federal and state governments through Medicare, Medicaid, CHIP and TRICARE.

26. For many years, PBMs went unnoticed. There was virtually no regulation of PBMs. Recently, however, PBMs have taken center stage in the nation's push towards gaining control of prescription drug prices and promoting transparency in the pharmacy benefit market. This has caused federal and state legislatures to shine a bright light on PBMs' unscrupulous business practices that have allowed them to realize billions in profit each year.

27. For example, in recognition of PBMs' troubling business practices and marketplace dominance, on June 7, 2022, the Federal Trade Commission ("FTC") announced that it was launching an in-depth examination of the six largest PBMs' impact on the access and affordability of prescription drugs.[2] Express Scripts, as one of these six PBMs, received a compulsory order from the FTC to provide information and records regarding its business practices. FTC Chair Lina M. Kahn stated, "[t]his study will shine a light on these companies' practices and their impact on pharmacies, payers, doctors, and patients[,]" which gives them enormous influence on which pharmacies patients can use.[3] One of the primary ways in which PBMs steer patients to their wholly owned and/or affiliated pharmacies is by seizing upon hypertechnical breaches of the Provider Agreement, or simply manufacturing alleged violations, to terminate pharmacies that compete with the pharmacies owned and/or affiliated with those PBMs.

28. In announcing its investigation, the FTC noted that it intends to investigate PBMs, including Express Scripts, and the practice of "steering" patients toward PBM-owned and/or affiliated pharmacies. The FTC further noted that as PBMs have steered patients to PBM-owned and/or affiliated pharmacies, from 2003 to 2018, over 1,230 independent, rural

---

[2] Federal Trade Commission, *FTC Launches Inquiry Into Prescription Drug Middlemen Industry*, online at https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drug-middlemen-industry (last accessed December 6, 2023).
[3] Ibid.

pharmacies/providers have closed their doors[4] and in that same time, 630 rural ZIP codes lost their only pharmacy provider.[5] The FTC's examination is active and ongoing.

29. In addition to the FTC's investigation, and as another example of the public concerns stemming from PBMs' business practices, the State of New York has also taken significant action concerning PBMs. On May 11, 2022, the New York State Department of Financial Services announced its establishment of the New York Pharmacy Benefits Bureau ("Bureau"). The Bureau is charged with promulgating regulations to eliminate patient steering and govern pharmacy credentialing, pharmacy reimbursement practices, and PBM audits that occur in the State of New York. In addition, the Bureau accepts and investigates complaints of PBM misconduct and is empowered to take corrective action in response thereto.

30. As yet another example of the nation's heightened scrutiny of PBMs, on March 30, 2023 the United States Senate Committee on Finance conducted a Full Committee Hearing entitled "Pharmacy Benefit Managers and the Prescription Drug Supply Chain: Impact on Patients and Taxpayers." In opening remarks during the March 30, 2023 Hearing, Senator and Chairman Ron Wyden of Oregon stated that "[i]n recent years, it's increasingly apparent that PBMs are using their data, market power, and know-how to keep prices high and pad their profits . . . I believe this is an industry that is headed in the wrong direction[.]" Unjustified terminations of independent pharmacies is but one tactic used by PBMs, in this case Express Scripts, to control the pharmacy marketplace and increase the likelihood that patients opt to use Express Scripts owned or affiliated pharmacies instead of independent pharmacies like InjuryScripts for the purposes of enriching the PBMs and their affiliates.

---

[4] Abiodun Salako, Fred Ullrich, Keith Mueller, Update: Independently Owned Pharmacy Closures in Rural America, 2003-2018, at 1 (July 2018), RUPRI Center for Rural Health Policy Analysis, University of Iowa College of Public Health, https://rupri.public-health.uiowa.edu/publications/policybriefs/2018/2018%20Pharmacy%20 Closures.pdf.
[5] Id. at 5.

31. The FTC's investigation, New York's establishment of the Bureau, and the Finance Committee's Hearing show that PBMs' business practices and conduct is of great concern throughout the country, both at the federal and state level.

**<u>InjuryScripts' Participation in Express Script's Pharmacy Networks</u>**

32. Most patients pay for prescriptions with insurance or government-sponsored prescription drug benefits. As a result, InjuryScripts' primary source of revenue is income earned from filling prescriptions for privately and publicly insured patients.

33. To fill prescriptions for government (or privately insured patients) and to receive payment in exchange for doing so, InjuryScripts must enter into contracts that establish the terms and conditions under which those prescriptions may be filled. Among other things, these contracts, in addition to setting forth terms unilaterally established by third party payers like Express Scripts, specify the rates at which InjuryScripts will be reimbursed for dispensing prescribed medications to patients and set out the procedures InjuryScripts must follow to confirm coverage and obtain reimbursement.

34. In Express Scripts' case, its relationship with network pharmacies is governed by various contractual documents, including a Pharmacy Provider Agreement, a Pharmacy Provider Manual, and numerous informal provider communications and Network Updates. Participating pharmacies must accept these terms and conditions to participate in Express Scripts' networks, otherwise they are not entitled to reimbursement for prescriptions dispensed to Express Scripts' patients.

35. A prospective pharmacy participant has no opportunity to negotiate the terms of the contract that governs the relationship between Express Scripts and a prospective pharmacy participant. InjuryScripts was not permitted to negotiate any terms of the Agreement (including

those defined below). The Agreement constitutes an adhesion contract that was unilaterally dictated by Express Scripts.

36. In this case, like most cases, the parties' contractual relationship consists of a Pharmacy Provider Agreement and a Pharmacy Provider Manual (the pharmacy Provider Agreement and Network Provider Manual are collectively referred to hereinafter as the "Agreement").

37. Pursuant to the Agreement, [redacted]

38. In particular, the Provider Manual states [redacted]

39. In addition to containing terms and conditions for InjuryScripts' participation in the Express Scripts' networks, the Provider Agreement also contains provisions that govern the parties' conduct in the event that one party is alleged to have defaulted in the performance of its obligations, and when Express Scripts is permitted to terminate a pharmacy.

40. In relevant part, the Provider Agreement states that:

[redacted]

[redacted][6]

41. The Provider Agreement further states [redacted]

[redacted]

[redacted]

42. The 2022 Provider Manual, which is the version of the contract that governs this dispute, provides Express Scripts with several remedies that it may elect to exercise, including [redacted] Importantly, Express Scripts is

---

[6] The Provider Agreement contains confidentiality provisions that prohibit Plaintiff from attaching it to the instant Complaint. However, Plaintiff is seeking leave to file the agreement under seal.

required to act in a reasonable and good faith manner in determining whether it should exercise these remedies. Express Scripts may exercise its remedy **only** in instances [redacted][7]

43. The 2022 Provider Manual [redacted] 42 CFR § 423.505(i) requires, among other things, "[e]ach and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain the following . . . (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations; (iv) Each and every contract must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions."

44. 42 CFR § 423.501 defines "First Tier Entity" as "any party that enters into a written arrangement, acceptable to CMS, with a Part D plan sponsor or application to provide administrative services or healthcare services for a Medicare eligible individual under Part D." Express Scripts is a First Tier Entity and must comply with all applicable federal laws, regulations, and CMS instructions in its relationship with pharmacies like InjuryScripts.

45. Thus, the contract incorporates federal law, which explicitly requires that contracts

---

[7] The Provider Manual contains confidentiality provisions that prohibit Plaintiff from attaching it to the instant Complaint. However, Plaintiff is seeking leave to file the agreement under seal.

between "first tier" entities like Express Scripts and "downstream, and related entities" like InjuryScripts "must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions." See 42 CFR § 423.505(i).

46. Among the federal laws that Express Scripts has incorporated by reference into its Contract with InjuryScripts is the federal "Any Willing Provider Law" ("AWPL"), codified in the Social Security Act at 42 U.S.C. §1395w-104(b)(1)(A). The AWPL applies directly to Medicare programs, and requires a prescription drug plan to permit the participation of any pharmacy that meets the terms and conditions of participation under the plan. InjuryScripts meets the reasonable and relevant terms and conditions of participation in Express Scripts' network(s).

47. The AWPL is further codified at 42 C.F.R. §423.505(b)(18), which states that a Part D plan sponsor, and all related first tier and downstream entities such as PBMs, must agree to have "a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy."

48. For approximately six (6) years, and without prior issue, InjuryScripts has serviced Express Scripts' beneficiaries through the provision of pharmaceutical services, including the provision of compounded and specialty medications. Thus, InjuryScripts meets the reasonable and relevant terms and conditions of participation in Express Scripts' network(s).

**Relationship Between InjuryScripts, the Owners, and Smart Pharmacy**

49. As mentioned above, the Owners, William Scrogins and Gregory Balotin, are the owners and operators of InjuryScripts.

50. The Owners previously owned two other pharmacies that provided compounding services in the state of Florida, Smart Pharmacy and SP2, LLC (collectively, "Smart and SP2").

The Owners were solely responsible for the operation of Smart and SP2 and the dispensing of medication to patients. Smart and SP2 have dissolved completely and are no longer in operation.

51. However, prior to dissolution, Smart and SP2 were active participants in TRICARE which was, and continues to be, administered by Express Scripts on behalf of the Defense Health Agency ("DHA"). Several audits and investigations of Smart and SP2 led to a series of administrative matters and legal disputes over whether Smart and SP2's practices complied with TRICARE regulations and federal law including the False Claims Act and Anti-kickback Statute.

52. At all times relevant, Express Scripts knew that Scrogins and Balotin were the co-owners and operators of Smart, SP2, and InjuryScripts.

**The *Qui Tam* Matter**

53. On December 2, 2014, Relator Amy Sanchez filed a *qui tam* action against Smart, SP2 and Balotin in the United States District Court for the Middle District of Florida captioned *United States ex rel. Sanchez v. Smart Pharmacy, Inc., et al.*, No. 3:14-cv-1453 (M.D. Fla.), pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b).

54. On March 31, 2016, Relator Ashok Kohli filed a *qui tam* action against Smart, SP2 and Balotin in the United States District Court for the Middle District of Florida captioned *United States ex rel. Kohli v. Smart Pharmacy, Inc., et al.*, No. 3:16-cv-387 (M.D. Fla.), pursuant to the False Claims Act as well.

55. On March 15, 2019, the United States filed notices of election to partially intervene in both matters.

56. On June 6, 2019, the United States District Court for the Middle District of Florida consolidated both matters. The United States filed a Complaint in Intervention in the consolidated action on June 13, 2019, and a First Amended Complaint in Intervention ("First Amended

Complaint") on March 2, 2020.

57. The core allegations against Smart, SP2 and Balotin were that they prepared compounded medications in a manner not approved for reimbursement under Express Scripts' Provider Agreement. The government also alleged that Smart, SP2 and Balotin waived, reduced, or failed to collect patient copayments in violation of the False Claims Act and Federal Anti-Kickback Statute. As a result of these allegations, Smart, SP2 and Balotin were suspended from participation in TRICARE by the DHA.

58. Smart, SP2 and Balotin denied, and continue to deny, the merit of these allegations. In fact, Smart and SP2 sued the government seeking declaratory judgment that the DHA's temporary claims payment suspensions and collection activities violated federal and state law. See *Smart Pharmacy, Inc. et al. v. Bono et al.*, No. 3:18-cv-525 (M.D. Fla.); *Smart Pharmacy, Inc., et al., v. Defense Health Agency, et al.*, No. 1:20-cv-00790 (E.D. Va.). Smart and SP2 also sued Express Scripts in the Eastern District of Missouri for, among other things, breach of contract for the payment suspensions. *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.).

59. Importantly, InjuryScripts was not the subject of any investigation, audits, or allegations giving rise to the *qui tam* matter and/or payment suspensions.

**The 2023 Settlement Agreement**

60. To facilitate a global resolution of all claims by the DHA against Smart, SP2 and the Owners, as well as all claims by Smart, SP2 and the Owners against DHA and Express Scripts, the parties ultimately engaged in extensive settlement discussions which culminated in the parties reaching a global settlement and executing a settlement agreement on June 14, 2023 (hereinafter,

the "2023 Settlement Agreement").[8] As a part of these extensive settlement discussions, it was made clear that a global resolution of all claims was a necessary component of settlement which included resolution of all claims as between Smart, SP2, the Owners and Express Scripts.

61. Pursuant to the 2023 Settlement Agreement, the "DHA agree[d] that it [would] not exercise its permissive exclusion authority against Smart Pharmacy, SP2, Balotin, and Scrogins pursuant to 32 C.F.R. § 199.9 with respect to conduct that occurred on or before the effective date of [the 2023 Settlement Agreement]." See **Exhibit D** at ¶ 1-2.

62. In exchange, Smart Pharmacy, SP2, Balotin, and Scrogins, as well as "any Entities Owned or Controlled by Balotin or Scrogins," agreed to refrain from submitting claims for reimbursement to the TRICARE program for a period of eight (8) years from the effective date of the 2023 Settlement Agreement. Id. at ¶ 2(a).

63. In addition, Smart Pharmacy, SP2, Balotin and Scrogins agreed to:

> [F]ully and finally release any claims that they have asserted, that they could have asserted, or that are in existence at the time of this settlement agreement (whether known or not) against DHA, its agencies, officers, agents, employees, and servants (including without limitation ***DHA's fiscal intermediaries***), pertaining to the TRICARE program, including without limitation claims alleged in *Smart Pharmacy, Inc. et al. v. Bono et al.*, No. 3:18-cv-525 (M.D. Fla.); *Smart Pharmacy, Inc., et al., v. Defense Health Agency, et al.*, No. 1:20-cv-00790 (E.D. Va.); or ***Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.).**
>
> [Id. at ¶ 2(c) (emphasis added).].

64. There is no question that Express Scripts is a fiscal intermediary of the DHA. The term "fiscal intermediary" is defined under the TRICARE regulations to mean "[a]n organization

[8] On the same day, the DOJ also executed a settlement agreement with Smart Pharmacy releasing the Relators claims against Smart Pharmacy in exchange for payment in the amount of $7,400,000.00 plus interest in installments. This DOJ Settlement Agreement can be found at online at https://www.justice.gov/d9/press-releases/attachments/2023/06/16/2023.06.14_-_smart_pharmacy_fca_settlement_agreement_-_executed_0.pdf.

with which the Director, OCHAMPUS, has entered into a contract for the adjudication and processing of CHAMPUS claims and the performance of related support activities." 32 C.F.R. § 199.2. As a "fiscal intermediary" of the DHA, Express Scripts was expressly incorporated into the 2023 Settlement Agreement and made party thereto.

65. Here, Express Scripts is a "fiscal intermediary" of the DHA because it is charged with administering the TRICARE benefits on behalf of the DHA. This includes, among other things, paying claims for reimbursement submitted by Smart, SP2, and InjuryScripts to TRICARE for services provided to TRICARE beneficiaries.

66. Importantly, pursuant to the 2023 Settlement Agreement, Express Scripts was relieved of all liability for any claims that may have been asserted prior to or at the time of the 2023 Settlement Agreement by Balotin, Scrogins, Smart and SP2, and any "Entities Owned or Controlled by Balotin or Scrogins." Id. at ¶ 2(c).

67. The 2023 Settlement Agreement defines "Entities Owned or Controlled by Balotin and Scrogins" expansively to include:

> [A]ny entity for which (i) Balotin or Scrogins has a direct or indirect ownership interest of 5 per cent or more in the entity; (ii) Balotin or Scrogins is the owner of a whole or part interest in any mortgage, deed of trust, note, or other obligation secured (in whole or in part) by the entity of any of the property or assets thereof, which whole or part interest is equal to or exceeds 5 per cent of the total property and assets of the entity; (iii) Balotin or Scrogins is an officer or director of the entity, if the entity is organized as a corporation; or (iv) Balotin or Scrogins is a partner in the entity, if the entity is a partnership.
>
> [Id. at ¶ 2(a).].

68. Thus, Express Scripts is not only incorporated by reference into the 2023 Settlement Agreement as DHA's "fiscal intermediary" but is a direct and intended beneficiary of the mutual

releases set forth therein.[9]

**Express Scripts' Wrongful Termination of InjuryScripts**

69. On September 22, 2023, in what was a shocking development in light of the 2023 Settlement Agreement, Express Scripts notified InjuryScripts that it was terminating InjuryScripts from participation in Express Scripts' networks effective December 15, 2023 ("Termination Letter"). See **Exhibit A**.

70. The Termination Letter states:

> Express Scripts has learned that on or about June 14, 2023, [InjuryScripts'] owners, Gregory Balotin ("Balotin") and William Scrogins ("Scrogins") (collectively, the "Owners") entered into two separate Settlement Agreements – one with the Department of Justice ("DOJ") on behalf of the Office of Inspector General of the Department of Health and Human Services (the "OIG") (the "OIG Settlement"), and the other with the Defense Health Agency ("DHA") on behalf of the TRICARE Program ("TRICARE") (the "TRICARE Settlement") (collectively, the "Settlements").
>
> [Id. at 1.].

71. The Termination Letter goes on to state that InjuryScripts agreed to provide services in accordance with the law and consistent with prevailing professional standards. It also states that, pursuant to [redacted] InjuryScripts was required to [redacted] Id. at 2.

72. Express Scripts' Termination Letter then states that "despite the DOJ, OIG, DHA, and TRICARE filing the First Amended Complaint on March 02, 2020, against the Owners,

[9] Moreover, the 2023 Settlement Agreement confers rights and obligations onto Express Scripts including, but not limited to, the right to deny any claims for reimbursement submitted to TRICARE within the eight (8) period. Id. at ¶ 2(a). ("In the event that Smart Pharmacy, SP2, Balotin, Scrogins or Entities Owned or Controlled by Balotin or Scrogins, submit claims for reimbursement to the TRICARE program during the eight (8) years, this Agreement is sufficient basis for DHA, or its fiscal intermediary, to deny the claim.") (emphasis added).

[InjuryScripts] failed to disclose, within ten (10) business days, that a regulatory authority had filed a complaint, or was seeking to discipline or otherwise reprimand, suspend, or exclude the Owners." Id. at 2.

73. For this reason, Express Scripts claimed, InjuryScripts breached the terms of the agreement warranting termination effective December 15, 2023. Ibid.

74. However, Express Scripts' termination of InjuryScripts on the grounds that InjuryScripts failed to disclose the allegations asserted in the *qui tam* matter and First Amended Complaint is not justified or otherwise permitted under the parties' Agreement.

**Express Scripts Knew of the Allegations Asserted in the *Qui Tam* Matter and First Amended Complaint as Early as May 2019**

75. Express Scripts was fully aware of the *qui tam* matter against Smart Pharmacy and Balotin as well as the underlying allegations therein as early as May 2019, when Smart Pharmacy's prior legal counsel advised Express Scripts that "the federal government is going to intervene in two pending qui tam cases: *Kohli v. Smart Pharmacy Inc., et al.*, No. 3:16-cv-387-J-39PDB and *Amy Sanchez v. Smart Pharmacy, Inc. et al.*, No. 3:14-cv-1453-J-34JBT, each pending in the United States District Court for the Middle District of Florida, Jacksonville Division." See **Exhibit E** at 4. Express Scripts' legal representatives were copied on this communication. Id. at 1.

76. Express Scripts was further notified of the *qui tam* matter when it was served with the DHA's motion to dismiss filed in the *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.) matter on August 2, 2021. See *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.), Dkt. 41-1. In fact, the DHA's motion to dismiss attached a **complete and accurate copy** of the government's First Amended Complaint Id.

77. Accordingly, Express Scripts knew of the *qui tam* matter as early as May 2019 and knew of the underlying allegations as early as August 2, 2021. In other words, Express Scripts

knew the full extent of the allegations asserted in the *qui tam* matter for at least two (2) years prior to serving InjuryScripts with the Termination Letter in which Express Scripts incredulously suggests that it only recently learned about such allegations.

78. By terminating InjuryScripts based on inaccurate allegations that Balotin and Scrogins failed to disclose the First Amended Complaint and associated allegations within ten (10) days from the date they arose, despite Express Scripts already knowing the same, Express Scripts is liable to InjuryScripts including for breach of contract.

79. In addition, Express Scripts' conduct breaches a 2015 Settlement Agreement wherein [redacted]

80. On or about June 29, 2010, Medco Health Solutions, Inc. ("Medco") – which was subsequently acquired by Express Scripts in April 2012 – conducted an on-site audit of Smart's claims submissions from the time period of approximately December 16, 2008 through May 28, 2010 which led to litigation.

81. On November 4, 2011, Smart Pharmacy, as part of a putative class action, filed a complaint against Medco/ESI in the United States District Court for the District of New Jersey. The matter was captioned *Smart Pharmacy, Inc., et al. v. Medco Health Solutions, Inc.,* No. 2:11-CV-6485 (D.N.J).

82. On February 23, 2015, [redacted]

[redacted][10]

83. More importantly, and for purposes of this litigation, [redacted]

84. [redacted]

85. [redacted]

86. [redacted]

---

[10] The Settlement Agreement contains confidentiality provisions that prohibit Plaintiff from attaching it to the instant Complaint. However, Plaintiff is seeking leave to file the agreement under seal.

[11] In particular, [redacted]

**InjuryScripts Will Suffer Irreparable Injury if the Termination Takes Effect**

87. InjuryScripts will suffer immediate and irreparable harm if Express Scripts is not enjoined from terminating InjuryScripts during the pendency of this litigation.

88. Express Scripts' unchecked market power makes contracting with Express Scripts essential for InjuryScripts to provide pharmacy services to patients—this is because Express Scripts is one of the three largest PBMs in the country and currently situated as the second largest in the country. For pharmacy providers, this often means that a significant percentage of their patient profile (and overall business) will consist of patients whose pharmacy benefits are managed and administered by Express Scripts. As it relates to InjuryScripts, participation in Express Scripts' pharmacy networks accounts for 20%, or one-fifth, of InjuryScripts' overall business annually.

89. Moreover, approximately 35% of the patients treated by InjuryScripts that are Express Scripts beneficiaries are Medicare patients. Medicare patients are typically either elderly or disabled. As a result, they are one of the sickest patient populations in the United States.

90. If InjuryScripts is terminated from Express Scripts networks, InjuryScripts will not only lose 20% of its business from a revenue perspective, its Medicare patients will be stripped of their pharmacy of choice and left scrambling to find another provider with the same compounding and specialty capabilities. For example, if InjuryScripts is terminated, the patients that utilize InjuryScripts for their essential medications will no longer be able to receive their prescriptions from InjuryScripts and will have very limited alternatives.

91. Termination from Express Scripts' networks will effectively destroy the entire business. This is because when a pharmacy is terminated from a PBM network, all other PBMs require participating pharmacies to notify the PBM if the pharmacy is terminated by any other PBM. Generally, this notice must include a detailed description of the grounds for termination.

PBMs purport to reserve the right to terminate any network provider also terminated by another PBM. Thus, Express Scripts' termination of InjuryScripts will require InjuryScripts to notify every other PBM with which it contracts which will cause additional terminations by those PBMs.

92. PBMs generally adhere to the principle that if a fellow PBM has terminated a particular pharmacy, it too should terminate the pharmacy for the same reason(s). Therefore, Express Scripts' termination will have a negative influence on other PBMs leading them to terminate InjuryScripts as well. Termination from Express Scripts' networks means that InjuryScripts will completely lose its ability to function as a pharmacy provider, causing InjuryScripts to ultimately terminate the employment of nearly one hundred (100) employees by late December of 2023 and close its doors permanently shortly thereafter.

93. For the limited time that InjuryScripts could stay open following termination, it will be required to turn away loyal, established patients who depend on InjuryScripts for their prescription needs. InjuryScripts will be forced to explain that it can no longer fill the patients' prescription(s), exacerbating the harm to InjuryScripts reputation built and cultivated over the past sixteen (16) years while serving the Jacksonville community.

94. InjuryScripts has served the Jacksonville community since 2007. It has spent considerable time and resources developing and cultivating its reputation and customer goodwill. InjuryScripts has earned a strong reputation for customer service and patient care in the Jacksonville, Florida community. InjuryScripts' patients and prescribers alike appreciate the high-quality service and attention they receive at InjuryScripts. InjuryScripts will lose this if Express Scripts' termination takes effect.

95. These injuries are irreparable with no adequate remedy at law which could compensate InjuryScripts for the injury and harm that Express Scripts' action and termination will cause if they are allowed to proceed. Prompt action and injunctive relief are warranted.

**COUNT ONE**
**(Breach of Contract – Provider Manual and Provider Agreement)**

96. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

97. Plaintiff entered into a valid, binding contract with Defendants, which consisted of the Pharmacy Provider Agreement and the Network Provider Manual.

98. The Agreement between InjuryScripts and Express Scripts was at all times relevant to this dispute a valid contract supported by adequate consideration.

99. Plaintiff and Express Scripts have a long-standing business relationship governed by the Agreement. Indeed, Plaintiff has participated in Express Scripts' networks since 2017.

100. At all times relevant to this dispute, Plaintiff complied with all terms, conditions, and/or obligations of the contract.

101. On September 22, 2023, Express Scripts issued a termination letter to InjuryScripts seeking to terminate InjuryScripts effective December 15, 2023.

102. The stated basis for the termination is the allegation that InjuryScripts did not disclose certain information that Express Scripts claims should have been disclosed pursuant to the parties' Agreement. See **Exhibit A**. In particular, Express Scripts complained that "despite the DOJ, OIG, DHA, and TRICARE filing the First Amended Complaint on March 02, 2020, against the Owners, [InjuryScripts] failed to disclose, within ten (10) business days, that a regulatory authority had filed a complaint, or was seeking to discipline or otherwise reprimand, suspend, or exclude the Owners." Id. However, this is not accurate and is otherwise erroneous.

103. In contrast to its allegations, Express Scripts knew the full extent of the allegations asserted in the *qui tam* matter for at least two (2) years prior to serving InjuryScripts with the Termination Letter.

104. Accordingly, Express Scripts does not have sufficient cause to terminate InjuryScripts from Express Scripts' networks and has violated the parties' Agreement and the terms therein including, but not necessarily limited to, [redacted] by terminating InjuryScripts without sufficient cause as required under these provisions.

105. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT TWO**
**(Breach of Contract –2023 Settlement Agreement)**

106. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

107. Separate and apart from the Provider Agreement and Provider Manual, the parties are bound by and must comply with the 2023 Settlement Agreement.

108. Indeed, as a "fiscal intermediary" of the DHA, Express Scripts was expressly incorporated into the 2023 Settlement Agreement. The term "fiscal intermediary" is defined under the TRICARE regulations to mean "[a]n organization with which the Director, OCHAMPUS, has entered into a contract for the adjudication and processing of CHAMPUS claims and the performance of related support activities." 32 C.F.R. § 199.2.

109. Express Scripts is a "fiscal intermediary" of the DHA because it is charged with administering the TRICARE benefits on behalf of the DHA. This includes, among other things,

paying claims for reimbursement submitted by Smart Pharmacy, SP2, and InjuryScripts to TRICARE for services provided to TRICARE beneficiaries.

110. In addition, under the 2023 Settlement Agreement, Express Scripts was relieved of all liability for any claims that may have been asserted prior to or at the time of the 2023 Settlement Agreement by Balotin, Scrogins, Smart and SP2, and any "Entities Owned or Controlled by Balotin or Scrogins." See **Exhibit D** at ¶ 2(c).

111. The 2023 Settlement Agreement defines "Entities Owned or Controlled by Balotin and Scrogins" expansively to include:

> [A]ny entity for which (i) Balotin or Scrogins has a direct or indirect ownership interest of 5 per cent or more in the entity; (ii) Balotin or Scrogins is the owner of a whole or part interest in any mortgage, deed of trust, note, or other obligation secured (in whole or in part) by the entity of any of the property or assets thereof, which whole or part interest is equal to or exceeds 5 per cent of the total property and assets of the entity; (iii) Balotin or Scrogins is an office or director of the entity, if the entity is organized as a corporation; or (iv) Balotin or Scrogins is a partner in the entity, if the entity is a partnership.
>
> [Id. at ¶ 2(a).].

112. Thus, Express Scripts is not only incorporated by reference into the 2023 Settlement Agreement as DHA's "fiscal intermediary" but is a direct beneficiary of the mutual releases set forth therein.

113. Pursuant to the 2023 Settlement Agreement, the "DHA agree[d] that it [would] not exercise its permissive exclusion authority against Smart Pharmacy, SP2, Balotin, and Scrogins pursuant to 32 C.F.R. § 199.9 with respect to conduct that occurred on or before the effective date of [the 2023 Settlement Agreement]." Id. at ¶ 1-2.

114. In exchange, Smart Pharmacy, SP2, Balotin, and Scrogins, as well as "any Entities Owned or Controlled by Balotin or Scrogins," agreed to refrain from submitting claims for

reimbursement to the TRICARE program for a period of eight (8) years from the effective date of the 2023 Settlement Agreement, Id. at ¶ 2(a), and to release all claims against the DHA and its fiscal intermediaries such as Express Scripts. Id. at ¶ 2(c).

115. By terminating InjuryScripts from network participation effective December 15, 2023, Express Scripts violated, at minimum, Paragraphs 1 and 2 of the 2023 Settlement Agreement by relying on allegations against Smart Pharmacy, the Owners, and the Entities Owned or Controlled by Balotin or Scrogins that were expressly released by and through the agreement to justify network termination.

116. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT THREE**
**(Breach of Contract – [redacted]**

117. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

118. Separate and apart from the Provider Agreement and Provider Manual, the parties are bound by and must comply with [redacted].

119. [redacted]

120. Express Scripts [redacted]

---

[12] See also *supra* note 10.

[redacted]

121. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT FOUR**
**(Breach of Contract –Provider Agreement and Provider Manual)**

122. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

123. The Parties entered into a contractual relationship by way of the Provider Agreement and the Network Provider Manual.

124. The Medicare Any Willing Provider Law, or AWPL, is one of many federal laws governing the parties' Agreement and conduct thereunder.

125. The Centers for Medicare and Medicaid Services ("CMS") is the federal agency charged with administering Medicare Part D benefits to eligible beneficiaries. CMS contracts with Medicare Part D Plan Sponsors to administer enrollee's prescription drug benefits. 42 U.S.C. § 1395w-112, *et seq*. Medicare Part D plan sponsors then delegate certain administrative obligations to their "first tier entities", including PBMs such as Express Scripts. The AWPL applies to plan sponsors and PBMs, as "first tier entities", in their administration of the Medicare Part D Program.

126. The AWPL requires a prescription drug plan to permit the participation of any pharmacy that meets the terms and conditions under the plan. Specifically, the AWPL requires Express Scripts to "agree to have a standard contract with ***reasonable and relevant*** terms and conditions for participation ***whereby any willing pharmacy may access the standard contract and participate as a network pharmacy***". 42 C.F.R. § 324.505(b)(18) (emphasis added). Additionally,

Medicare regulations require that Part D plan sponsors, and their PBM agents, "must contract with any pharmacy that meets the Part D sponsor's standard terms and conditions." 42 C.F.R. § 423.120(a)(8)(i). Indeed, in accordance with the AWPL, the Centers for Medicare and Medicaid Services has issued sub-regulatory guidance requiring that Part D plan's (and their agent PBM's) 'standard terms and conditions' be "reasonable and relevant" and further detailing that said "standard terms and conditions" relate to "conditions of participation established by the sponsor related to health and safety or financial integrity (such as licensure requirements, minimum levels of liability insurance, or accreditation), and that sponsors may negotiate varying payment rates to attract the network participation of certain pharmacies."[13]

127. Incumbent within the requirements imposed on PBMs by the AWPL – as articulated in guidance issued by CMS – is the requirement that terms and conditions be reasonable and relevant. Thus, the AWPL does not permit an insurer/PBM to establish **or to impose terms and conditions** that are not reasonable or relevant that would operate as a basis to exclude pharmacies from providing pharmacy services to Medicare Part D and Medicare Advantage patients. See 42 U.S.C. § 1395w-104(b), *et seq*.

128. The 2022 Provider Manual [redacted] 42 CFR § 423.505(i) requires, among other things, "[e]ach and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain the following . . . (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations; (iv) Each and every contract must specify

[13] Department of Health & Human Services, Centers for Medicare & Medicaid Services, *Compliance with Any Willing Provider (AWP) Requirements,* online at https://www.amcp.org/sites/default/files/2019-03/AnyWillingPharmacyGuidance.pdf (last accessed December 6, 2023).

that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions."

129. As a pharmacy authorized to provide pharmacy benefits to Medicare beneficiaries, InjuryScripts is protected by the AWPL. In addition, the AWPL is incorporated into the parties' Agreement by operation of law.

130. For the reasons set forth herein, Express Scripts violated the AWPL and in turn breached the Parties' Agreement by terminating InjuryScripts under false pretenses and without any factual or legal justification.

131. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT FIVE**
**(Breach of Contract – Provider Agreement and Provider Manual)**

132. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

133. The Parties entered into a contractual relationship by way of the Provider Agreement and the Network Provider Manual.

134. As set forth above, the 2022 Provider Manual [redacted] 42 CFR § 423.505(i) requires, among other things, "[e]ach and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain the following… (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations; (iv) Each and every contract must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions."

135. In addition, the Provider Manual [redacted]

136. As a pharmacy authorized to provide pharmacy benefits to Medicare beneficiaries, InjuryScripts is protected by Medicare rules and regulations.

137. As a PBM authorized to administer Medicare Part D benefits, Express Scripts is bound by and must comply with Medicare law.

138. Medicare statutes and regulations require that a contract between a provider and a Part D plan sponsor or agents thereof—including PBMs like Express Scripts—incorporate anti-retaliation provisions. See 42 C.F.R. § 423.505(b)(19) (incorporating 42 C.F.R. § 423.520).

139. 42 U.S.C. § 1395w-112(b)(4)(F) prohibits plans and/or their agents such as Express Scripts from retaliating against providers in response to complaints brought by the providers against the plan(s) and or their agent(s). Specifically, Section 1395w-112(b)(4)(F) states under subsection (i) that "[n]othing in this paragraph shall be construed to prohibit or limit a claim or action not covered by the subject matter of this section that any individual or organization has against a provider or a PDP sponsor." Subsection (ii) states that "Consistent with applicable Federal or State law, a PDP sponsor shall not retaliate against an individual or provider for exercising a right of action under this subparagraph." 42 U.S.C. § 1395w-112(b)(4)(F).

140. As mentioned earlier, Smart and SP2 exercised their lawful right to initiate litigation against Express Scripts to challenge Express Scripts' failure to pay Smart and SP2 on prescription drug claims in accordance with the parties' agreement. *See Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.).

141. Before Smart and SP2 were dissolved, those pharmacies shared common ownership with InjuryScripts by and through the Owners, William Scrogins and Gregory Balotin.

142. Based upon information and belief, Express Scripts terminated InjuryScripts to retaliate against the Owners for suing Express Scripts. In fact, Express Scripts waited until Smart, SP2, the Owners, and "Entities Owned or Controlled by Balotin or Scrogins" – including InjuryScripts – released forever any and all potential claims against they might have had against Express Scripts to terminate InjuryScripts. Accordingly, Express Scripts violated the anti-retaliation provision under 42 U.S.C. § 1395w-112(b)(4)(F) and in turn breached [redacted] of the Provider Manual.

143. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT SIX**
**(Violation of 42 U.S.C. § 1395w-112(b)(4)(F))**

144. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

145. As discussed immediately above, 42 U.S.C. § 1395w-112(b)(4)(F) prohibits plans and/or their agents such as Express Scripts from retaliating against providers in response to complaints brought by the providers against the plan(s) and or their agent(s).

146. By terminating InjuryScripts from network participation based upon Smart and SP2's exercise of a right of action against Express Scripts, Express Scripts has retaliated against InjuryScripts in violation of 42 U.S.C. § 1395w-112(b)(4)(F).

147. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

## COUNT SEVEN
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

148. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

149. In every contract executed under Missouri law, there is an implied covenant of good faith and fair dealing.

150. The Pharmacy Provider Agreement and Network Provider Manual contains an implied covenant of good faith and fair dealing and is subject to same.

151. The Pharmacy Provider Agreement and Network Provider Manual constitutes a valid, legally enforceable contract.

152. The Pharmacy Provider Agreement and Network Provider Manual confers upon Defendant substantial discretion to establish terms and conditions for participation in its pharmacy networks.

153. Express Scripts has abused this discretion and violated the implied covenant of good faith and fair dealing.

154. Specifically, Express Scripts has violated the implied covenant of good faith and fair dealing by manufacturing a false pretense to justify the termination of InjuryScripts from its networks. By terminating InjuryScripts on the grounds that the Owners failed to disclose the First Amended Complaint within ten (10) days from the date it was received, despite Express Scripts already possessing actual knowledge of the same, Express Scripts has acted in bad faith and deprived InjuryScripts of the benefits of its bargain.

155. As a direct and proximate result of Express Scripts' actions in breaching the implied covenant of good faith and fair dealing, InjuryScripts has suffered and will continue to suffer significant damages.

**COUNT EIGHT**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

156. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

157. In every contract executed under Missouri law, there is an implied covenant of good faith and fair dealing.

158. The 2023 Settlement Agreement contains an implied covenant of good faith and fair dealing and is subject to same.

159. The 2023 Settlement Agreement is a valid and enforceable contract.

160. As set forth above, and pursuant to the 2023 Settlement Agreement, the "DHA agree[d] that it [would] not exercise its permissive exclusion authority against Smart Pharmacy, SP2, Balotin, and Scrogins pursuant to 32 C.F.R. § 199.9 with respect to conduct that occurred on or before the effective date of [the 2023 Settlement Agreement]." See **Exhibit D** at ¶ 1-2.

161. In exchange, Smart Pharmacy, SP2, Balotin, and Scrogins, as well as "any Entities Owned or Controlled by Balotin or Scrogins" agreed to refrain from submitting claims for reimbursement to the TRICARE program for a period of eight (8) years from the effective date of the 2023 Settlement Agreement, Id. at ¶ 2(a), and to release all claims against the DHA and its fiscal intermediaries such as Express Scripts. Id. at ¶ 2(c).

162. Express Scripts violated the implied covenant of good faith and fair dealing by terminating InjuryScripts based upon allegations against Smart Pharmacy, the Owners, and the Entities Owned or Controlled by Balotin or Scrogins that were expressly released by and through the 2023 Settlement Agreement. Express Scripts has deprived Plaintiff of the benefit of its bargain by terminating InjuryScripts despite the mutual promises and exchanges set forth in the 2023 Settlement Agreement.

**COUNT NINE**
**(Tortious Interference with a Contract)**

163. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

164. The 2023 Settlement Agreement constitutes a valid and binding contract between Smart, SP2, the Owners, and "any Entities Owned or Controlled by Balotin and Scrogins", on the one hand, and DHA on the other.

165. As set forth above, the purpose of the 2023 Settlement Agreement was to bring about a global resolution of all claims against the parties arising from or related to the *qui tam* matter, which was a necessary component of the overall agreement to settle. See **Exhibit D**. In exchange for a release of all liability against them relating to the *qui tam* matter, Smart, SP2, the Owners, and "any Entities Owned or Controlled by Balotin and Scrogins" agreed to refrain from submitting claims to TRICARE for a period of eight (8) years. Id. at ¶ 2.

166. Express Scripts knew of the settlement agreement releasing the parties from all liability arising from or related to the *qui tam* matter because as part of the settlement, the Owners and Smart Pharmacy agreed to release pending legal claims they had against Express Scripts including specifically those arising in a litigation titled *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.). In addition, by and through the 2023 Settlement Agreement, Express Scripts was authorized to deny any claims for reimbursement submitted to TRICARE within the eight (8) period. Id. at ¶ 2(a).

167. Despite the mutual promises and obligations set forth therein, Express Scripts intentionally interfered with the 2023 Settlement Agreement by terminating InjuryScripts – an entity "Owned or Controlled by Balotin and Scrogins" – based upon the very same allegations expressly released by and through the 2023 Settlement Agreement.

168. Express Scripts was completely without justification to terminate InjuryScripts. While Express Scripts claimed to not have received notice of the First Amended Complaint filed in the *qui tam* matter as it alleges was required by the parties' agreement, Express Scripts already possessed actual knowledge of the First Amended Complaint as well as the underlying allegations. See **Exhibit E**; see also *Smart Pharmacy, Inc. et al., v. Express Scripts et al.*, No. 4:21-cv-321 (E.D. Mo.), Dkt. 41-1 (DHA's Motion to Dismiss attaching complete and accurate copy of First Amended Complaint).

169. As a direct and proximate result of Express Scripts' conduct, InjuryScripts has suffered and will continue to suffer significant damages.

**WHEREFORE**, Plaintiff InjuryScripts hereby respectfully requests that judgment be entered in its favor and against Express Scripts as follows:

(a) awarding Plaintiff compensatory damages in an amount to be determined at trial;

(b) awarding Plaintiff interest, attorneys' fees, and costs incurred herein;

(c) temporary injunctive relief pending resolution of this matter; and

(d) awarding Plaintiff such other relief as this Court deems just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff InjuryScripts Healthcare demands a trial by jury as to all claims and all issues properly so triable.

Respectfully submitted,

**FRIER & LEVITT, LLC**

By: *_/s/ Lucas W. Morgan, Esq._*

Jonathan E. Levitt, Esq. (Bar No. 65680)
Todd Mizeski, Esq. (Bar No. 25122001N)
Lucas Morgan, Esq. (Bar No. 120222014N)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
tmizeski@frierlevitt.com
lmorgan@frierlevitt.com

Dated: December 6, 2023

*Attorneys for Plaintiff, InjuryScripts*

**VERIFICATION**

William Scrogins, of full age, hereby certifies:

1. I am a co-owner of SPRX, Inc. d/b/a InjuryScripts.
2. I certify that the allegations set forth in the Complaint are true and accurate based on my personal knowledge.
3. I certify that the forgoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

By: William Scrogins
William Scrogins

Gregory Balotin, of full age, hereby certifies:

1. I am a co-owner of SPRX, Inc. d/b/a InjuryScripts.
2. I certify that the allegations set forth in the Complaint are true and accurate based on my personal knowledge.
3. I certify that the forgoing statements made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

By:____________________
Gregory Balotin

Dated: December 6, 2023